# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 26 2019, 6:53 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark K. Leeman
Leeman Law Office
Logansport, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Benjamin M.L. Jones
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Termination of the Parent-Child Relationship of A.H., B.H., and C.H. (Minor Children); | November 26, 2019 |
| J.H. (Father), | Court of Appeals Case No. 19A-JT-1259 |
| *Appellant-Respondent,* | Appeal from the Cass Circuit Court |
| v. | The Honorable Stephen Roger Kitts, Judge |
| The Indiana Department of Child Services, | Trial Court Cause Nos. 09C01-1903-JT-1 09C01-1903-JT-2 09C01-1903-JT-3 |
| *Appellee-Petitioner.* | |

**Pyle, Judge.**

# Statement of the Case

J.H. ("Father") appeals the termination of the parent-child relationship with his sons A.H.("A.H."), B.H. ("B.H."), and C.H. ("C.H.").[1] He contends that there is insufficient evidence to support the terminations. Specifically, Father argues that the Department of Child Services ("DCS") failed to prove by clear and convincing evidence that: (1) a continuation of the parent-child relationship poses a threat to the children's well-being; and (2) termination of the parent-child relationship is in the children's best interests. Concluding that there is sufficient evidence to support the termination of the parent-child relationships, we affirm the trial court's judgment.

We affirm.

# Issue[2]

Whether there is sufficient evidence to support the terminations.

# Facts

Father is the parent of A.H., who was born in April 2011; B.H., who was born in September 2013; and C.H., who was born in August 2016. In February

---

[1] The children's mother's ("Mother") parental rights were also terminated. However, she is not a party to this appeal.

[2] Father also argues that six of the trial court's sixty-two detailed findings are clearly erroneous because they are not supported by the evidence. However, because the fifty-six unchallenged detailed findings "provide ample support for the trial court's ultimate conclusion," any error in the six challenged findings is "merely harmless surplusage." *See In re B.J.*, 879 N.E.2d 7, 20 (Ind. Ct. App. 2008), *trans. denied*.

2017, DCS Family Case Manager James Steele ("FCM Steele") was assigned to assess allegations of neglect in Mother and Father's home. When FCM Steele arrived at the home, law enforcement officers were in the process of arresting Mother and Father. The officers had found paraphernalia and more than three grams of methamphetamine in an area of the home that was accessible to the children. Father admitted that he had manufactured methamphetamine in the home for his own use. Father, who refused a drug screen, was arrested and subsequently charged with Level 5 felony burglary, Level 6 felony possession of methamphetamine, Level 6 felony maintaining a common nuisance, and Class B misdemeanor possession of marijuana. As law enforcement officers were leading Mother and Father out of the home, an officer asked the parents if they wanted to give three-year-old B.H. a hug. Both parents declined and asked the officer for a cigarette.

[4] While law enforcement officers were with the parents, FCM Steele looked around the house and noticed that it was infested with cockroaches. FCM Steele specifically noticed cockroaches in the kitchen drawers and cabinets. He also noticed both dead and living cockroaches in the refrigerator. The bedroom that the three brothers shared upstairs had food, trash, broken toys, and urine on the floor. Based on these findings, FCM Steele believed that the children had been isolated in their room for long periods of time.

[5] The three children were removed from the home that day and placed in foster care. DCS Family Case Manager Laura Knutson ("FCM Knutson") was assigned to the children's cases. In March 2017, the parents admitted that their

three sons were children in need of services ("CHINS"). The following month, April 2017, the trial court ordered Father to: (1) keep all appointments with service providers; (2) provide safe and stable housing for his children; (3) obey the law; (4) abstain from the use of illegal substances; (5) attend visitation with his children; and (6) obtain a substance abuse assessment and follow all recommendations.

[6] Father, however, failed to comply with the court-ordered home-based, parenting, and addiction services. Further, he failed to attend eighteen of twenty scheduled visits with his children, including A.H.'s birthday visit. Parents also failed to notify FCM Knutson of changes in their address, and often the only way that the case manager could locate that parents was at their criminal court appearances.

[7] A bench warrant was issued in May 2017 when Father failed to appear in court for the February 2017 charges. In September 2017, Father pled guilty to the four February 2017 charges, and the trial court sentenced him to an aggregate sentence of six years, with an earliest release date of 2022.

[8] Eighteen months later, a March 2019 review hearing revealed that Father "had not enhanced his ability to fulfill [his] parental obligations [before his incarceration] [and] [had] not completed any parenting curriculum as offered by the Department of Correction facility." (Exhibits Vol. at 49, 95, 141). DCS filed a petition to terminate Father's parental rights two days later.

[9]     Testimony at the April 2019 termination hearing revealed that Father had not seen the children since April 2017. DCS Family Case Manager Jessica Risher ("FCM Risher"), who had been assigned to the case in December 2017, testified that the children had expressed several times that they were afraid of Father. FCM Risher further testified that even if Father were to be released before 2022, the children could not be immediately reunited with him. According to FCM Risher, "there would have to be a lot of therapy before [DCS] could even integrate [Father] into visits." (Tr. at 93). FCM Risher also testified that the children had been in foster care for two years and that the current plan for them was adoption. According to FCM Risher, termination of Father's parental rights was in the children's best interests.

[10]    Guardian Ad Litem Jeff Stanton ("GAL Stanton") also testified that termination was in the children's best interests. GAL Stanton further explained that the children were afraid of their father. According to GAL Stanton, the children were relaxed and comfortable in their foster home and removal from the foster parents would be traumatic for them. In addition, GAL Stanton testified that his recommendation would not change even if Father were to be released from incarceration the following day.

[11]    Father testified that he was "currently taking a program of therapeutic rehabilitation" while incarcerated. (Tr. at 107). According to Father, he was scheduled to complete the nine-month program in four months and would then be eligible for a sentence modification. Father testified that he had also been taking an Inside Outside Dad class for two weeks. In addition, Father testified

that he did not want the trial court to terminate his parental rights because "it would be in [the children's] best interest[s] to be with their mom and their dad." (Tr. at 110). Father further testified that he "would like to have [his] children back, yeah." (Tr. at 111).

[12] Following the hearing, the trial court explained its decision to terminate Father's parental rights as follows:

> What the record indicates to me is that we have a situation in which there were opportunities to participate [and] the father failed to and now as a result of whatever circumstances he may be in, effectively, you know, he would like a do-over, and that places the court in a position of having to weigh the father's interest in a do-over against the interests of the children and subjecting [the] children to several more years of limbo while this works out or doesn't. And by several more years of limbo, I am not referring to an out date of, that may or may not be true, but [what] I am referring to is also, the years of rehabilitation suggested as being necessary in best case scenario, [by] [DCS] in order to [e]ffect reunification. The suggestion is not in the best of all possible roles that this would happen upon release, it's a suggestion that the children and the foster care family should be subjected to several more years in any set of circumstances and I can't find that that is in the best interest of the children in this case either.

(Tr. at 115). Father now appeals the termination.

# Decision

[13] The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment to the United States Constitution. *In*

*re J.W., Jr.*, 27 N.E.3d 1185, 1187-88 (Ind. Ct. App. 2015), *trans. denied*.
However, a trial court must subordinate the interests of the parents to those of
the child when evaluating the circumstances surrounding a termination. *Id.* at
1188. Termination of the parent-child relationship is proper where a child's
emotional and physical development is threatened. *Id.* Although the right to
raise one's own child should not be terminated solely because there is a better
home available for the child, parental rights may be terminated when a parent is
unable or unwilling to meet his or her parental responsibilities. *Id.*

[14] Before an involuntary termination of parental rights may occur, DCS is
required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions
> > that resulted in the child's removal or the reasons for
> > placement outside the home of the parents will not be
> > remedied.
> >
> > (ii) There is a reasonable probability that the continuation
> > of the parent-child relationship poses a threat to the well-
> > being of the child.
> >
> > (iii) The child has, on two (2) separate occasions, been
> > adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of
> the child.

IND. CODE § 31-35-2-4(b)(2).  DCS must prove the alleged circumstances by clear and convincing evidence.  *K.T.K. v. Ind. Dep't of Child Servs.,* 989 N.E.2d 1225, 1230 (Ind. 2013).

[15]  When reviewing a termination of parental rights, this Court will not reweigh the evidence or judge the credibility of the witnesses.  *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016).  We consider only the evidence and any reasonable inferences to be drawn therefrom that support the judgment and give due regard to the trial court's opportunity to judge the credibility of the witnesses firsthand.  *K.T.K.*, 989 N.E.2d at 1229.

[16]  Father first argues that DCS failed to prove by clear and convincing evidence that a continuation of the parent-child relationship poses a threat to the children's well-being.  The continuation of the parent-child relationship poses a threat to children's well-being when:  (1) their parents engage in destructive and dangerous behavior; (2) the behavior is ongoing without any serious sign of improvement; and (3) the behavior poses a threat to their children.  *In re A.I.*, 825 N.E.2d 798, 807 (Ind. Ct. App. 2005), *trans. denied*.

[17]  In *A.I.*, parents appealed the termination of their parental rights and argued that there was insufficient evidence to support the trial court's finding that the continuation of the parent-child relationship posed a threat to A.I.  This Court responded as follows:

> Although there was no specific testimony that either parent had physically abused A.I., there can be little doubt that the parties' serious substance abuse addictions detrimentally affected or

greatly endangered her. The parties' failure to maintain stable employment and housing, as well as the constant drug use and sporadic domestic violence, renders the environment for A.I. destructive at best and dangerous at worst. We need not wait until A.I. suffer[s] permanent psychological or physical injury before intervening. There is sufficient evidence to support the trial court's finding.

*Id.* at 811.

[18] Here, as in *A.I.*, where Father manufactured methamphetamine in the family home and left the drug in an area of the home that was accessible to the children, there can be little doubt that Father's drug manufacturing detrimentally affected or greatly endangered the children. In addition, a kitchen infested with both living and dead cockroaches and a shared bedroom with food, trash, and urine on the floor also detrimentally affected or greatly endangered the children.

[19] We further note that Father failed to engage in any services and visited the children only two times before he was incarcerated for three felony convictions during the pendency of the CHINS proceedings. At the time of the termination hearing, he had not seen his children, who were scared of him, for two years. There is also no evidence that he had attempted to contact DCS during his incarceration to inquire about his children. Further, Father was incarcerated for over a year before he engaged in any therapeutic programs, and there was no evidence regarding Father's progress in the programs he was attending. In addition, Father's sole stated reason for wanting his children back was because

he simply believed that it was in their best interests to be with him. This evidence, which reveals that Father has engaged in destructive and dangerous behavior that posed a threat to his children without any serious sign of improvement, supports the trial court's conclusion that the continuation of the parent-child relationship poses a threat to the children's well-being.

[20] Father also argues that there is insufficient evidence that the termination was in the children's best interests. In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*. In so doing, the court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of the parent-child relationship is proper where the child's emotional and physical development is threatened. *In re R.S.*, 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*. "'A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that continuation of the parent-child relationship is contrary to the child's best interest.'" *In re B.D.J.*, 728 N.E.2d 195, 203 (Ind. Ct. App. 2000) (quoting *Matter of Adoption of D.V.H.*, 604 N.E.2d 634, 638 (Ind. Ct. App. 1992), *trans. denied, superseded by rule on other grounds*). Further, the testimony of the service providers may support a finding that termination is in the child's best interests. *McBride v. Monroe Cty. Office of Family and Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

[21] Here, our review of the evidence reveals that Father has historically been unable to provide housing, stability, and supervision for his children and was unable to provide the same at the time of the termination hearing. In addition, FCM Risher and GAL Stanton both testified that termination was in the children's best interests. The testimony of these service providers, as well as the other evidence previously discussed, supports the trial court's conclusion that termination was in the children's best interests.

[22] We reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made." *Egly v. Blackford Cty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). We find no such error here and therefore affirm the trial court.

[23] Affirmed.

Robb, J., and Mathias, J., concur.